# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LILLY BINET-QUINTANA,

      Plaintiff,

v.

                                      Civil Action No. 3:09cv722

DELAWARE NORTH COMPANIES TRAVEL
HOSPITALITY SERVICES, INC.,

      Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on two motions: Defendant Delaware North

Companies Travel Hospitality Services, Inc.'s ("Delaware North") Motion for Summary

Judgment (Docket No. 23), and Plaintiff Lilly Binet-Quintana's Motion for Leave to Reopen

30(b)(6) Deposition (Docket No. 21). The parties have responded (Docket Nos. 31, 29), and on

July 6, 2010, the Court heard oral argument. Additionally, at the Court's invitation, on July 7,

2010, the parties supplemented the record with the deposition of Lisa Cummins.[1] (Docket

No. 34.) The matters are ripe for disposition. The Court exercises jurisdiction pursuant to 28

U.S.C. §§ 1331 and 636(c).

For the reasons that follow, the Court will GRANT Delaware North's Motion for

Summary Judgment. (Docket No. 23.) Binet-Quintana's Motion for Leave to Reopen 30(b)(6)

Deposition will be DENIED AS MOOT. (Docket No. 21.)

---

[1] Cummins serves as an employee relations analyst for Delaware North Companies THC.
(Cummins Dep. 4:24-5:11.) Delaware North Companies THC "is the corporate office," and
Delaware North, the Defendant in this action, "is one of [the] subsidiaries of Delaware North
[Companies THC]." (Cummins Dep. 5:12-15.)

# I. Procedural Background

Binet-Quintana filed her original Complaint in this Court on November 16, 2009. (Docket No. 1.) Binet-Quintana alleged that she was terminated from her employment with Delaware North, doing business as Applebee's, in retaliation for lodging a complaint of sexual harassment and because she was discriminated against on the basis of gender and national origin. (Compl. ¶¶ 3, 25.)

On December 9, 2009, Delaware North filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion to Dismiss"). (Docket No. 5.) Delaware North moved the Court to dismiss Binet-Quintana's "vague allegations of national origin discrimination and gender discrimination." (Mot. Dismiss.) Binet opposed the Motion to Dismiss (Docket No. 13) and moved for leave to amend her Complaint (Docket No. 11).

On January 26, 2010, the Court granted Binet-Quintana leave to file an Amended Complaint. (Docket No. 14.) On February 5, 2010, Binet-Quintana filed her Amended Complaint, alleging that Delaware North violated the Civil Rights Act of 1964.[2] (Docket No. 18.) Specifically, the Amended Complaint raises two claims for relief: (1) a claim of sexual harassment; and, (2) a claim of retaliation arising from her complaint of sexual harassment. (Am. Compl. ¶¶ 32, 33.) On June 18, 2010, Delaware North filed a Motion for Summary Judgment. (Docket No. 23.)

# II. Standard of Review

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no

---

[2] *See* 42 U.S.C. § 2000e *et seq.*

genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex*, 477 U.S. at 322-24. These facts must be presented in the form of exhibits and sworn affidavits. Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995). Nonetheless, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (*quoting Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)). Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing Celotex*, 477 U.S. at 323-24).

### III. Factual Background

Delaware North employed Binet-Quintana as a hostess at an Applebee's restaurant at Richmond International Airport for a period of approximately four months in 2008. Her Amended Complaint arises out of conduct alleged to have occurred during her brief employment. Viewed in the light most favorable to Binet-Quintana, the facts follow.

## A.    <u>Delaware North Hired Binet-Quintana in February 2008</u>

On February 28, 2008, Delaware North's Human Resources Generalist James Stevenson hired Binet-Quintana to work at the Applebee's restaurant operated by Delaware North at the Richmond International Airport. (Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem."), Ex. C, Stevenson Decl. ("Stevenson Decl."), ¶¶ 2, 4.) (Docket No. 24.) Stevenson hired Binet-Quintana as a full-time, hourly hostess.[3] (Stevenson Decl. ¶ 4.) Binet-Quintana's duties as a hostess included welcoming guests, seating guests at available tables, and providing guests with menus after they were seated. (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), Ex. A, Binet-Quintana Dep. ("Binet-Quintana Dep."), at 18:5-10.) Occasionally, Binet-Quintana assisted the waitresses by cleaning the tables.[4] (Binet-Quintana Dep. 18:10-11.)

---

[3] At the time he hired her, Stevenson presented Binet-Quintana with an Orientation Packet that included Delaware North's Equal Employment Opportunity, Sexual Harassment and Retaliation Policy; Telephone Usage Policy; and Insubordination Policy. (Stevenson Decl. ¶¶ 3-4 & Stevenson Decl. Exs. 1-3.) Binet-Quintana signed a form acknowledging her receipt of these policies. (Stevenson Decl. ¶ 4 & Stevenson Decl. Ex. 4.)

[4] After she began working as a hostess, Binet-Quintana expressed interest in training to become a waitress. (*See* Binet-Quintana Dep. 52:2-5.) In April of 2008, Delaware North offered Binet-Quintana an opportunity to learn to waitress. (Binet-Quintana Dep. 52:6-23; Def.'s Mem. Ex. L, Bassett Decl. ("Bassett Decl."), ¶ 13.) Delaware North's Operations Manager Cain Bassett paired Binet-Quintana with an experienced server for training. (Bassett Decl. ¶ 13.) After several training shifts, Binet-Quintana informed Bassett that she wanted to return to her position as a hostess. (Bassett Decl. ¶ 15.) During the time Binet-Quintana trained as a waitress, Delaware North did not reduce her hourly hostess wage of $7.50 to the lower hourly wage of $3.50 for servers. (Bassett Decl. ¶ 15.)

4

## B.    Binet-Quintana Alleges Floyd Ballard Touched Her Inappropriately

Floyd Ballard, an Applebee's food and beverage manager, supervised Binet-Quintana.[5] (Binet-Quintana Dep. 17:25-18:4.) Ballard did not have any control over Binet-Quintana's work schedule, however. (Binet-Quintana Dep. 51:19-22.) He "did not have any authority to hire, fire, promote, relocate, or reassign [Binet-Quintana] to any other business unit or position," nor could he "make any decisions affecting her benefits or compensation." (Ballard Decl. ¶ 11.) Operations Manager Cain Bassett made Binet-Quintana's work schedule (Pl.'s Opp'n Ex. B, Bassett Dep. ("Bassett Dep."), at 60:5), and Binet-Quintana went to Bassett with any requests (Binet-Quintana Dep. 51:21-22).

Binet-Quintana contends that after she began working at Applebee's, Ballard acted inappropriately toward her on several occasions. She alleges six instances of inappropriate contact with Ballard.[6]

First, Ballard gave Binet-Quintana a bottle of water. (Binet-Quintana Dep. 22:5-12.) Binet-Quintana did not pay for the bottle of water. (Binet-Quintana Dep. 23:20-22.) General Manager Lance Sanson told Binet-Quintana that next time, she had to pay for the bottle of water. (Binet-Quintana Dep. 22:13-20.) Binet-Quintana found Sanson's comment to her regarding the water bottle to be "[o]ut of place." (Binet-Quintana Dep. 23:23-25.) No touching occurred during this incident. (Binet-Quintana Dep. 24:4-6.) Binet-Quintana does not believe this

---

[5] Ballard does not recall that he and Binet-Quintana shared similar work schedules. (Pl.'s Opp'n, Ex. D, Ballard Dep. ("Ballard Dep."), at 11:5-11.)

[6] As the Court mentions below, some dispute exists as to whether some of these alleged interactions ever took place or took place as alleged. For purposes of this motion, the Court will presume that each contact with Ballard occurred as alleged.

incident constituted harassment, but she describes it as a "difficult situation." (Binet-Quintana Dep. 22:21, 22:24-23:2.)

Second, on an unspecified date after she began working at Applebee's, Ballard asked Binet-Quintana to choose a lunch item from the Applebee's menu. (Binet-Quintana Dep. 24:10-16.) Binet-Quintana states that after "that terrible experience with a bottle of water, [she] wasn't going to accept lunch." (Binet-Quintana Dep. 24:13-14.) She declined Ballard's offer because she thought it was inappropriate. (Binet-Quintana Dep. 24:14-15.) When Binet-Quintana declined Ballard's offer, Ballard told her that if a supervisor offers her something, she should accept it. (Binet-Quintana Dep. 24:18-20.) Binet-Quintana again declined Ballard's offer. (Binet-Quintana Dep. 24:19-20.) Ballard did not make any other lunch offers after this interaction. (Binet-Quintana Dep. 25:2-7.)

Third, on several occasions during March of 2008, Ballard touched Binet-Quintana's shoulder and arm. (Binet-Quintana Dep. 25:25, 27:11-14.) When Ballard called Binet-Quintana, he would pull her by the arm. (Binet-Quintana Dep. 27:25.) Ballard explained that he "might have tapped her to let her know that she can go to lunch."[7] (Ballard Dep. 8:10-12.) Ballard described the manner in which he touched Binet-Quintana's arm as a patting motion. (Bassett Dep. 82:10-17.) Binet-Quintana did not tell Ballard to stop touching her or pulling her by her arm. (Binet-Quintana Dep. 28:14-19.)

---

[7] He denies touching Binet-Quintana in an inappropriate manner, however. (Ballard Decl. ¶ 6 ("While it is possible that I could have touched her arm or shoulder in greeting or to direct her to an area of the restaurant, I certainly never . . . touched her in an offensive or rude way.").)

6

Fourth, Ballard touched Binet-Quintana's chin in a suggestive manner. (Binet-Quintana Dep. 28:2-3.) At the time, Binet-Quintana had expressed some interest in learning to become a waitress. (*See* Binet-Quintana Dep. 51:1-12.) Binet-Quintana was speaking with another Applebee's employee named Jackie when Ballard approached and touched Binet-Quintana's chin, stating that she would be his waitress.[8] (Binet-Quintana Dep. 50:9-25, 109:1-5.)

Fifth, on April 6, 2008, Ballard touched or squeezed Binet-Quintana's breast. (Binet-Quintana Dep. 31:3-5.) Ballard and Binet-Quintana were walking down a hallway toward the kitchen door when another waitress, Jessica Coughlin, kicked open the kitchen door, carrying a tray of food. (Binet-Quintana Dep. 32:12-20; Ballard Decl. ¶ 4; Ballard Dep. 6:15-16.) Ballard stood approximately two feet from the kitchen door. (Binet-Quintana Dep. 33:23-34:4.) The

---

[8] Ballard denies touching Binet-Quintana's chin. (Def.'s Mem. Ex. I, Ballard Decl. ("Ballard Decl."), ¶ 6.) In addition, Jacquelin Stephenson, the employee with whom Binet-Quintana was speaking, states that she is "positive that [she] never saw Mr. Ballard touch Ms. Quintana on her chin." (Def.'s Mem. Ex. K, Stephenson Decl. ("Stephenson Decl."), ¶ 7.) Stephenson "never saw Floyd Ballard touch anyone inappropriately or make inappropriate or sexually-charged comments to anyone," and she "never heard Mr. Ballard say to Ms. Quintana or [Ms. Stephenson] that Ms. Quintana would be 'his waitress' or any words to that effect." (Stephenson Decl. ¶¶ 6-7.) Stephenson has retired from Delaware North. (Stephenson Decl. ¶¶ 2-3.)

At the time she complained to Delaware North about Ballard's conduct, Binet-Quintana did not allege that he had touched her chin. (*See* Stevenson Decl. ¶ 7; Def.'s Mem., Ex. F, Sanson Decl. ("Sanson Decl."), ¶¶ 6-7; Bassett Decl. ¶ 5.) On June 28, 2008, when she reported Ballard's conduct to the hotline, she did not allege that he had touched her chin. (*See* Def.'s Rebuttal Br. Supp. Mot. Summ. J. ("Def.'s Rebuttal"), Ex. B, Report # 806280201 ("7:48:00 a.m. Hotline Call"), at 1; Def.'s Rebuttal, Ex. C, Report # 806280213 ("8:12:00 a.m. Hotline Call"), at 1-2.)

Delaware North suggests that this Court can find that this touching did not occur because Binet-Quintana did not report it in April or June, because Ballard denies it, and because the very witness Binet-Quintana reports as confirming the event, Jacquelin Stephenson, also denies under oath that it occurred. Thus, Delaware North argues, no *reasonable* inference can be drawn from the evidence that Ballard touched Binet-Quintana on the chin as alleged. Because this Court rests its finding on another ground, it presumes for summary judgment that this interaction occurred as Binet-Quintana alleges.

kitchen door swung out toward Ballard and Binet-Quintana. (Binet-Quintana Dep. 34:5-17.) As the door opened, Ballard put his hand out to prevent a collision with Coughlin. (Ballard Decl. ¶ 4; Ballard Dep. 6:16-18.) Ballard touched Binet-Quintana's breast, and before he removed his hand, he squeezed her breast.[9] (Binet-Quintana Dep. 32:12-14.) Binet-Quintana discussed the April 6, 2008 kitchen door incident with four of her coworkers.[10] (Binet-Quintana Dep. 31:16-22.) Binet-Quintana twice reported that this touching could have been incidental (Binet-Quintana Dep. 43:12 ("I wasn't sure if it was accidentally or not."); 8:12:00 a.m. Hotline Call 1), but testified that she decided otherwise based on subsequent conduct by Ballard.

---

[9] Ballard denies touching Binet-Quintana's breast. (Ballard Decl. ¶ 4.) He states that when he made the blocking motion to prevent the collision with Coughlin, his hand hit Binet-Quintana's left shoulder. (Ballard Dep. 6:24-7:4.) Ballard states that "any contact with her was solely to prevent a collision between her and the waitress, Jessica Coughlin." (Ballard Decl. ¶ 5.) Binet-Quintana states that Ballard's reaction was unnecessary because she could see Coughlin exiting the kitchen. (Binet-Quintana Dep. 38:11-13.)

Coughlin "had a clear view of the entire incident," (Def.'s Mem. Ex. E, Coughlin Decl. ("Coughlin Decl."), ¶ 5), and did not see Ballard squeeze Binet-Quintana's breast. Ballard was looking at Coughlin as she came out of the kitchen, and not at Binet-Quintana. (Coughlin Decl. ¶ 5.) Coughlin saw Ballard's hand on Binet-Quintana's shoulder and upper arm, but not on her breast. (Coughlin Decl. ¶ 5; Def.'s Mem. Ex. G, Coughlin Dep. ("Coughlin Dep."), at 19:23-20:5.) Coughlin estimates that this contact lasted two seconds. (Coughlin Decl. ¶ 5; Coughlin Dep. 18:18-19.) Based on her observations, Coughlin is "sure that he never squeezed or groped her breast, because [she] was standing right there and saw that Mr. Ballard simply dropped his arm after stopping Ms. Binet." (Coughlin Decl. ¶ 5; Coughlin Dep. 20:8-12.)

Delaware North contends that, as with the chin-touching incident, no reasonable inference that Ballard touched or squeezed Binet-Quintana's breast can be discerned from the evidence before the Court. Delaware North highlights that in April, Binet-Quintana stated that the touching "could have been an accident" (Binet-Quintana Dep. 44:7-8); that as late as June, she reiterated that she "[did] not know whether or not Floyd touched her breast on purpose" (8:12:00 a.m. Hotline Call 1); and that the only independent witness - Coughlin - confirms Ballard did not touch Binet-Quintana's breast (Coughlin Decl. ¶ 5). The Court nonetheless presumes the facts as alleged by Binet-Quintana for purposes of summary judgment.

[10] The Court has no evidence from any of these coworkers.

Finally, Binet-Quintana reported the April 6, 2008 incident to Bassett on April 9, 2008.[11] (Bassett Decl. ¶ 4.) That the same day, Ballard rubbed Binet-Quintana's back "from neck to bottom gently."[12] (Binet-Quintana Dep. 43:12-16.) Because of the manner in which Ballard touched her back, Binet-Quintana then knew that Ballard did not accidentally touch her breast on April 6, 2008, and she reported to Bassett that Ballard had touched her. (Binet-Quintana Dep. 43:12-16, 42:14-43:3.)

## C. Delaware North Investigated Binet-Quintana's Complaint About Ballard

On April 9, 2008, Bassett informed Binet-Quintana that he would investigate the allegations immediately. (Bassett Decl. ¶ 4.) Bassett then informed General Manager Lance Sanson about Binet-Quintana's allegations, and, because the human resources officer, Stevenson, had already left for the day, scheduled investigation interviews for April 10, 2008. (Bassett Decl. ¶ 4.)

On April 10, 2008, Bassett, Sanson, and Stevenson met with Binet-Quintana. (Bassett Decl. ¶ 5; Sanson Decl. ¶ 6; Stevenson Decl. ¶ 6.) Binet-Quintana informed Bassett, Sanson, and Stevenson that Ballard had touched her arm and shoulder on several occasions, and that he had

---

[11] Binet-Quintana contends she informed Bassett of the April 6, 2008 incident on April 11, 2008. (*E.g.*, Binet-Quintana Dep. 31:6-8.)

[12] As with the previous allegations of impropriety, Ballard denies touching Binet-Quintana's back. (Ballard Decl. ¶ 6; Ballard Dep. 7:24-8:7.) Contemporaneous notes of Binet-Quintana's complaint to Delaware North about Ballard's conduct omit any allegation regarding her back. (*See* Stevenson Decl. ¶ 7; Sanson Decl. ¶¶ 6-7; Bassett Decl. ¶ 5. *But see* Stevenson Dep. 12:11-13 (stating that she "kind of referenced" her back when she reported Ballard's conduct to Delaware North).) Furthermore, on June 28, 2008, when she reported Ballard's conduct to the hotline, she did not allege that he had touched her back. (*See* 7:48:00 a.m. Hotline Call 1; 8:12:00 a.m. Hotline Call 1-2.) Delaware North again asks this Court to make a finding on summary judgment that the touching did not occur as alleged. As stated above, however, the Court presumes the facts as alleged by Binet-Quintana.

touched her breast once.[13] (Stevenson Decl. ¶ 7.) Binet-Quintana informed Bassett, Sanson, and

Stevenson that Ballard had also squeezed her breast.[14] (Binet-Quintana Dep. 48:19-25.) At the

conclusion of this meeting, Sanson asked Binet-Quintana what she wanted to happen as a result

of her complaint. (*See* Binet-Quintana Dep. 44:15-18.) Binet-Quintana requested that Delaware

North change Ballard's schedule, "send him to another place," or send her to another location.[15]

(Binet-Quintana Dep. 44:15-18.)

Directly after meeting with Binet-Quintana, Stevenson, Sanson, and Bassett met with

Ballard. (Stevenson Decl. ¶ 11; Sanson Decl. ¶ 9; Bassett Decl. ¶ 9.) Ballard recalled the

kitchen door incident, but adamantly denied touching Binet-Quintana's breast or touching her

inappropriately in any other manner. (Stevenson Decl. ¶ 11; Sanson Decl. ¶ 9; Bassett Decl. ¶ 9.)

---

[13] Stevenson, Bassett, and Sanson testified that Binet-Quintana "stated that the arm and shoulder touching bothered her, but it was not lewd or of a sexual nature." (Stevenson Decl. ¶ 7; Sanson Decl. ¶ 6; Bassett Decl. ¶ 5.) Additionally, they noted that Binet-Quintana could not identify any witnesses to any of the arm and shoulder touching. (Stevenson Decl. ¶ 7; Sanson Decl. ¶ 6; Bassett Decl. ¶ 5.)

[14] Bassett, Sanson, and Stevenson deny that Binet-Quintana informed them that Ballard had squeezed her breast. (Stevenson Decl. ¶ 8; Sanson Decl. ¶ 7; Bassett Decl. ¶ 6.) All three witnesses instead testify that Binet-Quintana informed them that the April 6, 2008 incident in which Ballard touched her breast could have been accidental. (Stevenson Decl. ¶ 8; Sanson Decl. ¶ 7; Bassett Decl. ¶ 6; Binet-Quintana Dep. 53:10-13; *see also* Cummins Dep. 35:12-36:19 (stating that most people complaining of sexual harassment do not question whether the complained-of conduct was intentional).) For purposes of summary judgment, however, the Court presumes Ballard squeezed Binet-Quintana's breast.

[15] Bassett, Sanson, and Stevenson deny that Binet-Quintana requested that either she or Ballard be transferred. (*See* Stevenson Decl. ¶ 9; Sanson Decl. ¶ 8; Bassett Decl. ¶ 7.) Bassett recalls that he "specifically asked if she wanted to be transferred to another business unit at the end of the airport concourse, where waitresses have the opportunity to earn more money." (Bassett Decl. ¶ 7.) Binet-Quintana declined the opportunity to transfer to another location (Bassett Decl. ¶ 7), and informed Bassett that she did not want anything to happen to Ballard (Stevenson Decl. ¶ 9; Sanson Decl. ¶ 8; Bassett Decl. ¶ 7). The Court will presume, however, for purposes of this motion, that Binet-Quintana requested that either she or Ballard be transferred.

Ballard admitted touching Binet-Quintana on the shoulder occasionally to tell her to go to lunch. (Ballard Dep. 8:10-12.)

After speaking with both Binet-Quintana and Ballard, Stevenson, Sanson, and Bassett concluded the limited and incidental contact resulting from the kitchen door incident was not sexual harassment. (Stevenson Decl. ¶ 12; Sanson Decl. ¶ 10; Bassett Decl. ¶ 10-11.) Nevertheless, they counseled Ballard to refrain from touching Binet-Quintana in any way and reminded him of Delaware North's sexual harassment and retaliation policies. (Stevenson Decl. ¶ 12; Sanson Decl. ¶ 10; Bassett Decl. ¶ 10-11.) After Binet-Quintana complained to Delaware North, Ballard did not touch her again. (Binet-Quintana Dep. 63:2-4.) Ballard limited his interactions with Binet-Quintana to avoid the possibility of any further complaints. (Ballard Decl. ¶ 7.)

Although Ballard never touched her again (Binet-Quintana Dep. 58:24-59:5), Binet-Quintana states that the fact that Ballard was still employed made her uncomfortable.[16] (Binet-Quintana Dep. 61:17-23.) Despite several requests that either she or Ballard be moved (Binet-Quintana Dep. 62:5-10), Binet-Quintana continued to work with Ballard on the same schedule as she had worked prior to her complaint (Binet-Quintana Dep. 45:4-8).[17] She felt that Delaware

---

[16] Specifically, Binet-Quintana felt that the manner in which Ballard used his cellular telephone was meant to threaten her. (Binet-Quintana Dep. 60:9-13.) Other than describing that Ballard would sometimes talk on his cellular phone while he paced the lobby (Binet-Quintana Dep. 60:9-13), however, Binet-Quintana provides no explanation of why she found Ballard's use of his cellular phone threatening.

[17] Bassett flatly denies this statement. He contends that Binet-Quintana requested that Delaware North change her schedule so that she finished work one hour earlier, meaning that she would not have to close the restaurant with Ballard, and Bassett made the change. (Stevenson Decl. ¶ 9; Sanson Decl. ¶ 8; Bassett Decl. ¶ 7.) Again, however, for purposes of this motion, the

11

North had not responded appropriately to her complaint because "nothing happened," despite the fact that she had "reported something very serious." (Binet-Quintana Dep. 62:1-3.) Binet-Quintana felt that Delaware North "did not pay attention to [her]." (Binet-Quintana Dep. 62:3-4.) Between April and June of 2008, however, she did not lodge any additional complaints about Ballard (Stevenson Decl. ¶ 13; Sanson Decl. ¶ 11; Bassett Decl. ¶ 12), nor did she continue to request that Ballard be moved to another location (Binet-Quintana Dep. 62:17-24).[18] Binet-Quintana does not deny that any touching ceased after Delaware North's investigation (Binet-Quintana Dep. 63:2-4), nor does she allege any other conduct by Ballard that would violate Title VII after the investigation concluded.

### D. Lance Sanson Determined Binet-Quintana Exhibited Insubordination On Three Dates in June 2008

Prior to June 26, 2008, Sanson had never disciplined Binet-Quintana nor complained to her about her work. (Binet-Quintana Dep. 63:25-64:7; 65:6-7.) On June 26, June 27, and June 30, 2008, however, Sanson disciplined Binet-Quintana because of her attitude and performance.

#### 1. June 26, 2008: Binet-Quintana Took an Unofficial Break, Chewed Gum on Duty, and Refused to Speak in English to Sanson

On June 26, 2008, Sanson approached Applebee's and did not see any hostesses at the hostess station. (Sanson Decl. ¶ 12.) Because it was lunch time, Sanson stood at the hostess

---

Court will presume that Binet-Quintana worked the same schedule as she had prior to her complaint.

[18] Ballard states that after resolution of Binet-Quintana's complaint, he was afraid "that she would falsely accuse [him] of harassment again." (Ballard Decl. ¶ 7.) Accordingly, when he worked the same shift as Binet-Quintana, he chose not to reprimand her when he saw her leave her station, neglect to seat customers, or use her cellular telephone. (Ballard Decl. ¶ 8.) Ballard did not want to be accused of retaliating against Binet-Quintana as a result of her complaint. (Ballard Decl. ¶ 8.)

station to greet customers. (Sanson Decl. ¶ 12.) He then saw Binet-Quintana speaking with an airport custodian in the atrium outside the restaurant. (Sanson Decl. ¶ 12.) Coughlin reports that this was not the first time Binet-Quintana had spoken with the airport custodian: "At least two (2) times a day, [Binet-Quintana] would leave her hostess station unattended at the restaurant and go talk to an airport custodian, Eduardo, in the atrium." (Coughlin Decl. ¶ 7.) She normally spoke with Eduardo for approximately ten minutes. (Coughlin Decl. ¶ 7.)

On this occasion on June 26, 2008, Sanson allowed the conversation to continue for a few minutes, but when the conversation did not end, he went into the atrium and approached Binet-Quintana. (Sanson Decl. ¶ 12.) Binet-Quintana admits she spoke with the custodian for "a couple minutes." (Binet-Quintana Dep. 65:16.) Coughlin, who witnessed the incident, estimates Binet-Quintana spoke with Eduardo for about ten minutes. (Coughlin Decl. ¶ 9.) Sanson asked Binet-Quintana if she were on a break. (Sanson Decl. ¶ 12.) She was not on an official break, but returning from the restroom. (Binet-Quintana Dep. 68:18-19.) When she replied that she was not on an official break, Sanson asked her to return to work. (Sanson Decl. ¶ 12.) Binet-Quintana "began to say goodbye to the gentleman" (Binet-Quintana Dep. 65:19), but continued her conversation (Binet-Quintana Dep. 70:21-24).[19] Sanson again asked Binet-Quintana to return to work. (Sanson Decl. ¶ 12.) She refused. (Sanson Decl. ¶ 12.) Sanson asked Binet-Quintana a third time to return to work. (Sanson Decl. ¶ 12.) After Sanson's third request, Binet-Quintana "angrily complied" and walked briskly back to the hostess station ahead of Sanson. (Sanson

---

[19] Sanson states that Binet-Quintana gave Sanson a dirty look, rolled her eyes, turned her back to him, and continued her conversation with the custodian. (Sanson Decl. ¶ 12; *see* Binet-Quintana Dep. 70:21-24 (acknowledging that she continued to speak to the janitor).) This difference in characterization of Binet-Quintana's response is immaterial.

Decl. ¶ 12.) Sanson grabbed her arm and pulled her back to her station.[20] (Binet-Quintana Dep. 65:24-66:3; *see also* 7:48:00 a.m. Hotline Call 2 (reporting that Sanson held Binet-Quintana's arm and escorted her back to her station).)

When Sanson arrived at the hostess station, he noticed that Binet-Quintana was chewing gum. (Sanson Decl. ¶ 13.) Delaware North does not permit on-duty hostesses to chew gum. (Sanson Decl. ¶ 13; *see* Stevenson Decl. Ex. 3, Work Rules & Regulations, Section II: Associate Conduct (prohibiting employees from arguing with managers or refusing to obey reasonable requests, and noting that the document containing the enumerated employee rules and regulations "is not an all inclusive list").) Binet-Quintana knew that she was not permitted to chew gum at work. (Binet-Quintana Dep. 72:22.) Sanson asked Binet-Quintana to remove her gum. (Sanson Decl. ¶ 13.) She did not remove it.[21] (Sanson Decl. ¶ 13.) Binet-Quintana admits that she was angry with Sanson, so she did not obey him. (Binet-Quintana Dep. 66:5-7.) Sanson asked her a second time to remove her gum, and she took it out of her mouth and showed it to him. (Sanson Decl. ¶ 13.)

Because she was visibly upset, Sanson headed to the kitchen to give Binet-Quintana a few minutes to cool off. (Sanson Decl. ¶ 14.) As Sanson walked to the kitchen, Coughlin asked Binet-Quintana why she was so angry and upset. (Coughlin Decl. ¶ 11.) Binet-Quintana stated,

---

[20] Sanson denies grabbing Binet-Quintana's arm and dragging her back to the hostess station. (Sanson Decl. ¶ 12.) Coughlin saw Sanson place his hand on Binet-Quintana's back to guide her to the restaurant, but she denies that Sanson grabbed Binet-Quintana's arm or pulled her to her station. (Coughlin Decl. ¶ 9.) For purposes of this motion, however, the Court will presume that Sanson grabbed Binet-Quintana's arm.

[21] Sanson contends Binet-Quintana looked at him with a smirk and did not remove her gum. (Sanson Decl. ¶ 13.) The difference in characterization is not material.

"'He's a dickhead!' . . . so loudly that the customers and patrons at the bar could clearly hear her." (Coughlin Decl. ¶ 11; *see also* Bassett Dep. 20:4-8.) Binet-Quintana does not deny making this statement.

Sanson attempted to speak with Binet-Quintana about her insubordinate conduct.[22] (Sanson Decl. ¶ 14.) He told Binet-Quintana that she had an attitude. (Binet-Quintana Dep. 66:10-13.) She became angry and began speaking to Sanson loudly and angrily in Spanish. (Sanson Decl. ¶ 14; Binet-Quintana Dep. 66:18-19.) Sanson does not speak fluent Spanish, so he asked Binet-Quintana to speak in English to him. (Sanson Decl. ¶ 14.) She refused and continued speaking angrily in Spanish. (Sanson Decl. ¶ 14; Binet-Quintana Dep. 73:21.) Because Binet-Quintana was visibly upset and customers were watching Sanson and Binet-Quintana's interaction, Sanson sent Binet-Quintana home for the rest of the afternoon. (Sanson Decl. ¶ 14; Def.'s Mem. Ex. D. Sanson Dep. ("Sanson Dep."), at 49:24-50:5; 7:48:00 a.m. Hotline Call 2.) Binet-Quintana does not deny that she continued to speak to Sanson in Spanish despite his request that she speak in English. (Binet-Quintana Dep. 83:14-84:6.)

### 2. June 27, 2008: Binet-Quintana Spoke Sarcastically to Sanson

On June 27, 2008, Binet-Quintana reported to work "as if nothing had happened." (Binet-Quintana Dep. 66:23-24.) She discussed with her coworkers the problem she had experienced with Sanson the previous day. (Binet-Quintana Dep. 67:1-7.)

---

[22] During this conversation, Binet-Quintana also requested time off to attend an upcoming court hearing. (Binet-Quintana Dep. 66:17-22; 7:48:00 a.m. Hotline Call 2.) Sanson responded that Binet-Quintana's scheduling issues were not his problem. (Binet-Quintana Dep. 66:17-18; 7:48:00 a.m. Hotline Call 2.)

When Sanson arrived, he said hello to Binet-Quintana and asked, in Spanish, how she was. (Sanson Decl. ¶ 15; 7:48:00 a.m. Hotline Call 2.) In Spanish, Sanson told Binet-Quintana to return to her position and begin work, but he did not tell her coworkers to return to their positions.[23] (Binet-Quintana Dep. 67:9-12.) Binet-Quintana responded, "'Oh, now you speak Spanish.'" (Sanson Decl. ¶ 15.) Binet-Quintana admits that this exchange with Sanson was sarcastic. (Binet-Quintana Dep. 91:16-23.) Sanson walked back to the kitchen. (Binet-Quintana Dep. 67:14-15; Sanson Decl. ¶ 15).

Binet-Quintana told Bassett about the problems she experienced with Sanson on June 26, 2008. (Binet-Quintana Dep. 73:22.) Bassett asked her to explain what had happened because he was surprised to learn that Sanson had told Binet-Quintana that she had a bad attitude. (Binet-Quintana Dep. 67:17-21.)

### 3. June 28, 2008: Binet-Quintana Made Two Hotline Complaints About Sanson and Ballard

On Saturday, June 28, 2008, before she went to work, Binet-Quintana called the company hotline number to make a complaint. (*See* Binet-Quintana Dep. 73:23-24; Def.'s Mem. Ex. O, Kelly Decl. ("Kelly Decl."), ¶ 9.) She made two phone calls to the hotline, resulting in two complaints. (Kelly Decl. ¶ 9; 7:48:00 a.m. Hotline Call; 8:12:00 a.m. Hotline Call.)

The first complaint catalogued the water bottle and lunch incidents with Ballard, and also explained the June 26, 2008 and June 27, 2008 interactions with Sanson. (7:48:00 a.m. Hotline Call 1-2; *see also* Stevenson Decl. ¶ 15.) Binet-Quintana did not make any allegations that Sanson had disciplined her because of her gender, race, or national origin.

---

[23] In her 7:48:00 a.m. Hotline Call, Binet-Quintana stated only that Sanson asked her, "'Que pasa (What's wrong)?'" (7:48:00 a.m. Hotline Call 2.)

The second complaint reiterated the March 2008 and April 2008 contact with Ballard. (8:12:00 a.m. Hotline Call 1; *see also* Stevenson Decl. ¶ 15.) Binet-Quintana explained that she called the hotline on June 28, 2008 because she "was afraid . . . to be fired." (Binet-Quintana Dep. 76:3-4.)

### 4.     June 30, 2008: Binet-Quintana Used Her Cellular Telephone on Duty

On Monday, June 30, 2008, at approximately 7:45 p.m., Sanson entered the main dining entrance of Applebee's and saw Binet-Quintana in the middle of the dining room using her cell phone. (Sanson Decl. ¶ 16.) Binet-Quintana contends that the kitchen was closed, and the entire restaurant was empty. (Binet-Quintana Dep. 74:5-6.) She had her phone open and was checking her messages to see if her sick mother had called her. (Binet-Quintana Dep. 74:7-9; 92:22-25.) Sanson concluded that Binet-Quintana was violating Delaware North's cell phone policy. (Sanson Dep. 50:15-25.) Sanson asked her to put the phone away, but Binet-Quintana continued using her phone. (Sanson Decl. ¶ 16.) After Sanson asked her a second time to put her phone away, she complied. (Sanson Decl. ¶ 16.) Sanson counseled Binet-Quintana on appropriate use of cell phones during work. (Sanson Decl. ¶ 16.) He also counseled her to respond in a more positive manner. (Sanson Decl. ¶ 16.)

As Sanson spoke to Binet-Quintana, she responded "in a rude fashion and repeatedly stated 'okay,' clearly ignoring the conversation and challenging [Sanson's] instructions." (Sanson Decl. ¶ 16.) Binet-Quintana does not deny that she continually repeated "okay" in a sarcastic manner during this interaction. (Binet-Quintana Dep. 93:15-23.) Sanson reported to Bassett that she also called Sanson an asshole. (Bassett Dep. 23:16-24:6.) Binet-Quintana does

17

not deny this exchange with Sanson. At this point, Sanson decided to terminate her employment because of her rude and insubordinate behavior. (Sanson Decl. ¶ 16.)

### E. Sanson Fired Binet-Quintana on June 30, 2008

At the conclusion of their discussion regarding Binet-Quintana's use of her cellular telephone, Sanson told Binet-Quintana she was fired, and she responded, "Okay." (Binet-Quintana Dep. 74:17-18.) At 10:25 p.m. on June 30, 2008, Sanson emailed Stevenson and explained that he had decided to terminate Binet-Quintana as a result of her insubordinate conduct.[24] (Def.'s Mem. Ex. H, Sanson Email.) Ballard was on vacation at the time Sanson fired Binet-Quintana. (Ballard Decl. ¶ 9; Ballard Dep. 9:14-18.)

On June 30, 2008, Sanson did not know that Binet-Quintana had made two hotline complaints. (Sanson Dep. 50:6-10.) The Delaware North parent company corporate office was not aware of Binet-Quintana's hotline complaints until Monday, June 30, 2008 (Stevenson Decl. ¶ 15; *see also* Cummins Dep. 21:20-22 (stating that the hotline call "came in . . . at 6/30 at . . . Eight-o-four in the morning")), at which time Stevenson learned of Binet-Quintana's hotline calls (Bassett Dep. 61:19-22). He did not tell anyone about the hotline call on June 30, 2008, however. (Bassett Dep. 65:1-6.) Stevenson did not inform Sanson until the day after Sanson had fired Binet-Quintana that she had made two hotline complaints prior to her termination. (Stevenson Decl. ¶ 15; Sanson Decl. ¶ 17.)

---

[24] At a later grievance hearing, Sanson upheld his decision to terminate Binet-Quintana's employment with Delaware North. (Bassett Dep. 38:9-12.)

Binet-Quintana does not contest that Sanson did not know about the hotline calls when he fired her. On June 30, 2008, Binet-Quintana reported to the hotline that she believed she was terminated for reporting Ballard's sexual harassment. (7:48:00 a.m. Hotline Complaint 2.)

## IV. Analysis

### A. Binet-Quintana's Sexual Harassment Claim Cannot Survive Summary Judgment

#### 1. To Make Out a Hostile Work Environment Claim, a Plaintiff Must Prove Four Elements

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."[25] *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66 (1986).

"Of course . . . not all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII. For sexual

---

[25] "The [United States Court of Appeals for the] Fourth Circuit recognizes two types of prohibited sexual harassment: [1] 'harassment that creates an offensive (hostile) work environment and [2] harassment where sexual consideration is demanded in exchange for job benefits.'" *Byers v. HSBC Fin. Corp.,* 416 F. Supp. 2d 424, 431-32 (E.D. Va. 2006) (*quoting Spencer v. Gen. Elec. Co.,* 894 F.2d 651, 658 (4th Cir. 1990), *overruled on other grounds by Farrar v. Hobby,* 506 U.S. 103 (1992)). Here, Binet-Quintana does not allege that she suffered *quid pro quo* sexual harassment. Although in her Memorandum in Opposition to Delaware North's Motion for Summary Judgment Binet-Quintana contends that Ballard made advances "under the guise of offering her small material benefits" (Pl.'s Opp'n 14), Binet-Quintana fails to allege a *quid pro quo* case, and the Court finds no factual support for this proposition in the record. The Court construes Binet-Quintana's claim to be one for hostile work environment, and the parties have proceeded on that basis.

19

harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Id.* at 67 (internal citations omitted) (alteration in original). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment.").

Accordingly, "[t]o make out a hostile work environment claim, the claimant 'must prove: (1) that [s]he was harassed "because of" [her] "sex;" (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer.'" *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) (*quoting Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)) (second and third alterations in original).

### 2. Binet-Quintana Fails to Establish a Prima Facie Case of Sexual Harassment

Binet-Quintana's claim appears to fail because she cannot establish that the harassment was sufficiently severe or pervasive to create an abusive working environment. The Court need not rest on this finding, however, because Binet-Quintana also cannot establish that any basis exists to impute liability to Delaware North.[26]

---

[26] Viewing the facts in the light most favorable to Binet-Quintana, the Court presumes, without finding, that she was subject to unwelcome harassment. (*See, e.g.* Binet-Quintana Dep.

### a. Binet-Quintana Fails to Establish That the Harassment Was Sufficiently Severe or Pervasive so as to Alter the Conditions of Her Employment

"[I]n the Fourth Circuit, the question of whether 'harassment was sufficiently severe or pervasive is quintessentially a question of fact.'" *Hartsell*, 123 F.3d at 773 (*quoting Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir. 1989), *overruled in part on other grounds by* 900 F.2d 27 (4th Cir. 1990)). A court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Additionally, courts may consider the effect on the employer's psychological well-being, if any. *Id.*

"[N]o single factor is required," however. *Id.* Courts must undertake "careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81. Even assuming all of a plaintiff's claims to be true, however, summary judgment may lie if the plaintiff's claims are "so trivial, so isolated, and [fall] so far from the paradigmatic case of sexual harassment." *Hartsell*, 123 F.3d at 773.

In this case, Binet-Quintana alleges six types of unwelcome interaction with Ballard in a relatively short period of time: a less than two-month span beginning in March of 2008, and terminating April 9, 2008. The Court notes that these events, even if true, do not appear to

---

67:22-23 ("I told them all in no way, shape, or form I liked to be touched.").) Although Binet-Quintana proffers no evidence that Ballard initiated such contact because of her sex, and instead contends in briefing that "[i]t is implausible that Ballard would have gently caressed another man's back, stroked a male coworker's chin, grabbed a male employee's breast, and repeatedly touched the shoulder, arm, and back of a male employee at Delaware North . . . " (Pl.'s Opp'n 11), the Court presumes, without finding, that Binet-Quintana suffered harassment because of her sex.

suggest the type of conduct sufficiently severe or pervasive to alter the terms and conditions of Binet-Quintana's employment. *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (finding that a supervisor's conduct, which included bumping into the plaintiff; positioning a magnifying glass over the plaintiff's crotch; flipping the plaintiff's tie over to see its label; giving the plaintiff a congratulatory kiss in the receiving line of plaintiff's wedding; and staring at the plaintiff in the bathroom, "was undoubtedly tasteless and inappropriately forward," but not actionable); *Byers*, 416 F. Supp. 2d at 433-35 (finding that supervisor's actions, including asking the plaintiff if he had a girlfriend; inviting him to places outside of work; taking a piece of food from his plate; touching her breasts to the back of the plaintiff's head; hugging the plaintiff; and giving him a neck massage; did not create an environment that a reasonable person would find hostile or abusive).

Here, at least two instances do not suggest, even as alleged, actionable conduct: the giving of a bottle of water and the suggestion, which was denied, that lunch be selected from the menu. The other interactions are so isolated or trivial that they do not necessarily allege a hostile work environment. Binet-Quintana's claims that Ballard occasionally touched her arm (Binet-Quintana Dep. 27:25), and touched her chin and back one time each (Binet-Quintana Dep. 50:9-25, 43:12-16) appear to this Court to be "so trivial, so isolated, and so far from the paradigmatic case of sexual harassment" that they do not indicate a hostile work environment.[27] *Hartsell*, 123

---

[27] Binet-Quintana also likely fails to establish that Ballard's actions interfered with her work performance. *See Harris*, 510 U.S. at 23 (requiring the Court to consider whether the harassment unreasonably interfered with the employee's work performance). The record before the Court suggests that the physical contact between Ballard and Binet-Quintana was not "of a forceful, physically threatening, or humiliating nature, nor does [Binet-Quintana] allege that [s]he felt intimidated, threatened, or humiliated by [Ballard's] conduct." *Byers*, 416 F. Supp. 2d at 436. At most, Binet-Quintana alleges that her contact with Ballard made her feel

22

F.3d at 773. Nonetheless, the most serious allegation - that Ballard squeezed her breast - could raise concern, if true. The Court thinks it likely that "[c]onsidering all the circumstances in light of the *Harris* factors, the conduct alleged [might not be] severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Byers*, 416 F. Supp. 2d at 435. However, because the Court rests its decision on another ground, it need not address this factor fully. Without deciding factor three, the Court turns its analysis to liability, the decisive factor at issue here.

### b. Binet-Quintana Fails to Establish that Ballard's Conduct Is Imputable to Delaware North

The record establishes that Binet-Quintana clearly fails to establish Delaware North's liability for Ballard's conduct: Ballard did not act as Binet-Quintana's supervisor, and, upon Delaware North's investigation of her complaint, the allegedly harassing behavior stopped immediately. This failure to impute liability to Delaware North is fatal to Binet-Quintana's claim.

### i. Ballard Was Not Binet-Quintana's Supervisor

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). A supervisor "make[s] economic decisions affecting other employees under his or her control," such as

_____

"uncomfortable." (8:12:00 a.m. Hotline Call 1.) Absent being sent home early on one day, she has adduced no evidence that this contact with Ballard caused her to miss work or somehow affected her duties as a hostess.

decisions to hire, fire, promote, or reassign. *Id.* at 761-62; *see also Mikels v. City of Durham*, 183 F.3d 323, 333 (4th Cir. 1999).

Binet-Quintana fails to establish that Ballard was her supervisor. Binet-Quintana has adduced no evidence that Ballard could hire, fire, promote, demote, or take any other direct action against Binet-Quintana. *See Howard v. Winter*, 446 F.3d 559, 566 (4th Cir. 2006). Accordingly, she cannot impute liability to Delaware North.

Contrary to Binet-Quintana's assertions, the fact that Ballard held a managerial title does not suffice to impute liability to Delaware North. Although he may have been a higher-ranking Applebee's employee who could effectuate lunch breaks, Ballard's authority over Binet-Quintana "was at best minimal." *Mikels*, 183 F.3d at 334 (finding that a police corporal's authority over a private-level member of the same squad was minimal and did not include the power to take tangible employment actions); *see also Howard*, 446 F.3d at 566 (finding that the alleged supervisor's authority "was only an occasional authority - shared with the other fifty-four staff members - to direct [the plaintiff's] operational duties"). Ballard's limited authority to direct Binet-Quintana does not constitute supervisory status sufficient to impute liability to Delaware North. *See Mikels*, 183 F.3d at 334; *Howard*, 446 F.3d at 566.

### ii.   Upon Delaware North's Investigation, the Harassment Stopped

Viewing Ballard's conduct under the appropriate legal basis, Binet-Quintana fails to establish Delaware North's liability for Ballard's conduct. "[W]here an employee is sexually harassed by a coworker . . . the employer may be liable only 'if it knew or should have known about the harassment and failed to take effective action to stop it.'" *Howard*, 446 F.3d at 565

(*quoting Ochletree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003)). An employer need not "make the most effective response possible" to avoid liability. *Spicer v. Va. Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995). An employer also does not need to credit each of the plaintiff's allegations in order to escape liability. *Swentek v. USAir, Inc.*, 830 F.2d 552, 558 (4th Cir. 1987), *abrogated by Mikels*, 183 F.3d 323. Rather, if an employer takes remedial action, "when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well." *Spicer*, 66 F.3d at 711; *see also Swentek*, 830 F.2d at 558 (finding that the plaintiff had failed to establish employer liability because the employer investigated her claims and presented a reasonable basis for its actions, and the allegedly harassing conduct stopped after the employer's reprimand).

Here, as the Fourth Circuit found in *Spicer*, "the record . . . does not even colorably support a conclusion that the [defendant's] response [to the plaintiff's sexual harassment claim] was inadequate." *Spicer*, 66 F.3d at 710. Upon Binet-Quintana's complaint, Delaware North took immediate action to investigate. One day after Binet-Quintana's complaint, management met with Binet-Quintana and Ballard, and requested each party's version of the kitchen door incident. (Bassett Decl. ¶¶ 5, 9; Sanson Decl. ¶¶ 6, 9; Stevenson Decl. ¶¶ 6, 11.) Delaware North counseled Ballard to avoid touching Binet-Quintana in any way. (Bassett Decl. ¶¶ 10-11; Stevenson Decl. ¶ 12; Sanson Decl. ¶ 10.) Additionally, the hotline administrator continued to attempt to gather information to investigate Binet-Quintana's complaint. (*See* 7:48:00 a.m. Hotline Call; 8:12:00 a.m. Hotline Call.) The record before the Court simply belies Binet-Quintana's protestations during oral argument that Delaware North's investigation was a "sham."

Most importantly, however, after Delaware North's investigation of Binet-Quintana's complaint, Binet-Quintana confirms that the allegedly harassing conduct stopped. (Binet-Quintana Dep. 58:24-59:5, 63:2-4.) Binet-Quintana made no further complaints about Ballard's conduct. While, during litigation, Binet-Quintana has noted displeasure with Delaware North's handling of the investigation (*see* Binet-Quintana Dep. 62:1-4), the law does not require an employer to take remedial measures designed to address each of a complainant's concerns. *See Spicer*, 66 F.3d at 710; *Swentek*, 830 F.2d at 558. Once some remedial action is taken, an employer's liability terminates with the cessation of the allegedly inappropriate touching. *Spicer*, 66 F.3d at 711. Because any unwanted touching by Ballard stopped upon Delaware North's investigation of Binet-Quintana's complaint, Binet-Quintana fails to establish that Ballard's conduct is imputable to Delaware North.

### B.     Binet-Quintana's Retaliation Claim Cannot Survive Summary Judgment

#### 1.     To Establish a Claim of Retaliation, a Plaintiff Must Meet Three Elements

Section 704(a) of Title VII contains an anti-retaliation provision, which provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. 2000e-3(a). The anti-retaliation provision prevents "employer[s] from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). Courts

interpret this provision broadly because the accomplishment of the goals of Title VII depends on the "cooperation of employees who are willing to file complaints and act as witnesses." *Id.* at 67.

To succeed on a retaliation claim, a plaintiff must first establish a prima facie case of retaliation. A plaintiff must show that: (1) the plaintiff was engaged in a protected activity; (2) the employer acted adversely against the plaintiff; and, (3) the protected activity was causally connected to the adverse action. *Laughlin v. Metro. Washington Airports*, 149 F.3d 253, 258 (4th Cir. 1998).

Once a plaintiff has established a prima facie case of retaliation, in the absence of direct evidence, the Court must then analyze the claim for retaliation under the *McDonnell Douglas* burden-shifting scheme. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Under *McDonnell Douglas*, after the plaintiff has established a prima facie case, the burden shifts to the employer to provide a legitimate reason for the adverse employment action. *Id.* at 802. If the employer provides a legitimate, nonretaliatory reason for an adverse employment action, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (*citing McDonnell Douglas*, 411 U.S. at 804).

## 2. Binet-Quintana Fails to Establish a Prima Facie Case of Retaliation

The parties do not dispute that Binet-Quintana experienced an adverse employment action when she was terminated from her employment with Delaware North. Nevertheless, Binet-Quintana cannot establish a prima facie case of retaliation because she cannot establish that she was engaged in protected activity at the time she made her hotline complaint. More importantly,

27

however, even presuming her hotline complaint to be a protected activity, Binet-Quintana cannot establish that her termination was causally connected to her hotline complaint.

### a.   Binet-Quintana Was Not Engaged in Protected Activity

"The plain meaning of the statutory language provides protection of an employee's opposition activity when the employee responds to an actual unlawful employment practice." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th 2002). "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin*, 149 F.3d at 259. "An employee's opposition activity is only protected, however, if the employee . . . opposed . . . actually unlawful activity, or, if there was no actual violation, if [the] employee reasonably believed that the employment practice she is opposing is unlawful." *Parker v. Smithfield Packing Co.*, No. 2:06cv468, 2007 WL 983845, at *7 (E.D. Va. Mar. 26, 2007) (*citing Jordan*, 458 F.3d at 338-39).

Although Binet-Quintana may have engaged in an informal grievance procedure by reporting a claim of sexual harassment through Delaware North's hotline, she could not have reasonably believed she was opposing an unlawful employment practice. *See Jordan*, 458 F.3d at 341; *Parker*, 2007 WL 983845, at *7. First, with respect to her complaints about Ballard's conduct, Binet-Quintana called the hotline and reported Ballard's conduct on June 28, 2008. (7:48:00 a.m. Hotline Call 1-2; 8:12:00 a.m. Hotline Call 1.) However, Binet-Quintana confirms that no sexually harassing conduct had occurred after April 9, 2008. (*See* Binet-Quintana Dep. 58:24-59:5 (stating that after she informed management about the April 6, 2008 kitchen door incident, Ballard never touched her again).) Accordingly, at the time she made her complaint to

28

the hotline, "no objectively reasonable person could have believed that the [restaurant] was, or was soon going to be, infected by severe or pervasive [discriminatory], threatening, or humiliating harassment," *Jordan*, 458 F.3d at 341, based on Ballard's earlier, and corrected, conduct.

Second, Binet-Quintana makes no allegation that her interactions with Sanson occurred because of her gender, race, or national origin.[28] Therefore, her complaint to the hotline about Sanson does not implicate Title VII. By complaining about these interactions with Sanson, Binet-Quintana could not have reasonably believed she was opposing an unlawful employment practice. *See id.*

### b. Binet-Quintana Fails to Establish Causation

"To satisfy the third element, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). This requires first that the plaintiff prove that the employer knew that the plaintiff had engaged in a protected activity: such knowledge "is absolutely necessary to establish the third element of the prima facie case." *Id.*

At the time he terminated Binet-Quintana's employment on Monday, June 30, 2008, Sanson did not know that she had made two hotline complaints on Saturday, June 28, 2008. (Sanson Dep. 50:6-10.) Moreover, although Stevenson found out about Binet-Quintana's hotline call on June 30, 2008 (Bassett Dep. 61:19-22), he did not tell any other Delaware North

---

[28] Although some events with Sanson involve her speaking Spanish, Binet-Quintana does not allege her firing stemmed from race discrimination. Her Amended Complaint alleges sex discrimination and the heart of her retaliation claim clearly rests in a claim that she was fired for reporting Ballard's conduct in April.

employees about the hotline call. (Bassett Dep 65:1-6.) Binet-Quintana does not dispute Sanson's lack of knowledge about any protected activity regarding her hotline call. Accordingly, Binet-Quintana cannot establish causation, i.e., that Delaware North had knowledge of her protected activity prior to its decision to terminate her. Moreover, causation cannot stem from the April complaints that Binet-Quintana admits resulted in corrected conduct.

### 3. Binet-Quintana Cannot Establish Pretext

Even presuming Binet-Quintana had established a prima facie case of retaliation, this claim nevertheless fails because she cannot establish that Delaware North's proffered reason for her termination was pretext for an unlawful reason. *See Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 802-03. Sanson terminated Binet-Quintana for insubordination. (Sanson Decl. ¶ 17.) Ample evidence indicates that this constitutes a legitimate, nonretaliatory reason for Binet-Quintana's termination.

First, Binet-Quintana does not contest the events of June 26, 2008. Binet-Quintana does not contest that she left her work area to speak with another airport employee while not on an official break, and that she did not comply with Sanson's request that she return to work until he asked a third time. (*See* Binet-Quintana Dep. 65:8-69:16.) She does not contest that she disobeyed Sanson's instruction to remove her gum, even though she knew she was not supposed to chew gum on duty. (Binet Quintana Dep. 72:15-73:8.) She does not deny the testimony that she used a foul epithet describing Sanson. (*See* Coughlin Decl. ¶ 11; Bassett Dep. 20:4-8.) She does not contest that, despite Sanson's request, she refused to speak English to him. (*See* Binet-Quintana Dep. 73:21.)

Second, Binet-Quintana does not contest the events of June 27, 2008. Binet-Quintana admits that she spoke to Sanson sarcastically when he addressed her in Spanish. (Binet-Quintana Dep. 91:16-20.) Finally, she does not contest that on June 30, 2008, when Sanson addressed her use of her cellular telephone while on duty, she continually repeated, "okay," in a sarcastic manner. (Binet-Quintana Dep. 93:15-23.) Binet-Quintana does not deny the testimony that she again referred to Sanson in a derogatory manner. (Bassett Dep. 23:16-24:6.)

These instances of insubordination offered Delaware North legitimate reasons to terminate Binet-Quintana's employment. These interactions with Sanson were unrelated to any complaints about Ballard's conduct. Binet-Quintana's own "naked opinion" that Delaware North terminated her employment based on a pretextual reason does not create a genuine dispute of material fact sufficient to survive summary judgment. *See Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988). Accordingly, the Court finds that, even if Binet-Quintana had established a prima facie case of retaliation, Delaware North offered a legitimate, nonretaliatory reason for terminating her employment.

## V. Conclusion

For the foregoing reasons, the Court will GRANT Delaware North's Motion for Summary Judgment. (Docket No. 23.) Binet-Quintana's Amended Complaint will be DISMISSED WITH PREJUDICE. (Docket No. 18.)

In addition, Binet-Quintana's Motion for Leave to Reopen 30(b)(6) Deposition (Docket No. 21) will be DENIED AS MOOT. Binet-Quintana's motion relates to what she claims is the belated discovery of videotaped security footage of her June 26, 2008 interaction with Sanson. Delaware North contends that the videotape contradicts Binet-Quintana's version of events

31

because it shows that Sanson did not grab Binet-Quintana's arm. Binet-Quintana does not adopt or deny Delaware North's claim about what the videotape does or does not show. Binet-Quintana seeks to have Delaware North's corporate representative review the videotape and comment on its contents.

It is not clear that having Delaware North review a tape produced by another entity, the Transportation Security Administration, would produce relevant testimony. In any event, because the videotape allegedly establishes the falsity of Binet-Quintana's statements with respect to her interaction with Sanson on June 26, 2008, it would not affect the Court's decision with respect to Delaware North's Motion for Summary Judgment. Even if Binet-Quintana were to conduct discovery and somehow discredit Delaware North's version of what the videotape shows, the Court has presumed, for summary judgment, that Sanson grabbed her arm. Accordingly, this motion will be DENIED AS MOOT.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date: July 12, 2010

32